ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Guang Dong Light Headgear Factory Co., Ltd., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ACI International, Inc., | ) ) | |
| Defendant. | ) ) ) | |
| | ) | Case No. 03-4165-JAR |
| ACI International, Inc., | ) ) | |
| Counterclaim Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| Guang Dong Light Headgear Factory Co., Ltd., Alex He, and ATTA International, Inc., | ) ) ) ) | |
| Counterclaim Defendants. | ) ) ) | |

## <u>MEMORANDUM AND ORDER</u>

The Court now considers plaintiff Guang Dong Light Headgear Factory Co., Ltd.'s ("Guang Dong") Motion for Partial Summary Judgment (Doc. 126) and Motion for Partial Summary Judgment on ACI's Counterclaim Counts XI, XII, and XIII (Doc. 170). These motions are now fully briefed and the Court is prepared to rule. As described more fully below, the Court grants Guang Dong's motion on its claim to confirm the foreign arbitral award and denies summary judgment on all of ACI's counterclaims against Guang Dong.

I.       **Uncontroverted Facts**

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to ACI.  The Court only recites facts material to the arguments made by the parties in these summary judgment briefs.  Guang Dong is a state owned factory located in the People's Republic of China that produces headwear.  Defendant ACI International, Inc. ("ACI") is a Kansas corporation that identifies companies in the United States that are looking for headwear production and provides that production by using factories in Asia.  Prior to 1999, ACI routinely contracted with China Pearl International ("China Pearl"), who would then contract directly with Guang Dong for headwear production.  These contracts provided for thirty-day credit terms.  ACI would make commission payments to China Pearl for the headwear orders.

*Sales Contracts*

In December 1998, a document entitled "Sales Contract" was forwarded by ACI to Guang Dong.  This document lists Guang Dong as the seller and ACI as the Buyer.  It states: "This Sales  Contract is made by and between the Seller's [sic] and the Buyers whereby the seller agree [sic] to sell and the Buyers agree to buy the under-mentioned goods according to the terms and conditions specified below."  This contract for headwear contained a thirty-day credit term and an arbitration clause.  At the top was a handwritten note: "Please confirm, sign and stamp then fax back."[1]

In approximately the beginning of 1999, ACI requested an increase in its credit terms to ninety days.  ACI's credit terms were extended in 1999 and it continued to receive invoices from China Pearl for products manufactured by Guang Dong and continued making payment directly

[1](Doc. 132, Ex. F.)

to China Pearl for headwear covered by those purchase orders.  After ACI's credit terms were extended, ACI continued to receive invoices from China Pearl for products manufactured by Guang Dong.

Starting in 1999, a number of documents entitled "Sales Contracts" were exchanged between Guang Dong and ACI.  These documents appear to be identical form contracts, that list ACI as the buyer and Guang Dong as the seller.  They are substantially similar in language and form to the December 1998 sales contract, except that they each provide for a ninety-day credit limit.  Each sales contract includes an arbitration clause that states:

> All disputes arising from the execution of, or in connection with this contract shall be settled amicably through friendly negotiation. In case no settlement can be reached through negotiation, the case shall then be submitted to the Foreign Economic and Trade Arbitration Commission of the China Council for the Promotion of International Trade, Beijing[2] for arbitration in accordance with its provisional rules of procedure.  The arbitral award is final and binding upon both parties.

In August 2000, Guang Dong executed a Notice of Nondisclosure of Proprietary and Confidential Information at ACI's request.  This notice appears to be a standard form used for vendors, and states:

> Vendor/undersigned below acknowledges and agrees that any information obtained while under contract to ACI International Inc., relating to ACI's plans, product development, suppliers or customer contacts is highly confidential, and is important to ACI and the effective operation of ACI's business.  The vendor agrees that while under contract by ACI, and at any time thereafter,  the vendor will make no disclosure or use of any kind, directly or indirectly, of information concerning any confidential or

---

[2]This body is the same entity as the China International Economic and Trade Arbitration Commission, or CIETAC.  CIETAC was set up in 1956 and renamed "Foreign Economic and Trade Arbitration Commission" in 1980.  It was renamed again CIETAC in 1998. *See* China International Economic and Trade Arbitration Commission, Introduction, http://www.cietac.org.cn/english/introduction/intro_1.htm (2004).

> proprietary matters relating to ACI or any of its activities, except
> pursuant to the work contracted for by ACI International, Inc.[3]

From July 26, 2000 to January 9, 2001, fourteen of these sales contracts were exchanged between Guang Dong and ACI and they are the subject of the arbitration confirmation proceeding before the Court.  ACI President Chris Davis and a representative from Guang Dong signed all but three of the sales contracts, two of which were signed by Linda Schroeder, ACI's comptroller.[4]  The signatures on behalf of ACI were all next to the line labeled "Buyer" and the stamps and signatures on behalf of Guang Dong are all next to the line labeled "Seller."  Each of these fourteen documents contained an incorrect price term, however, because they included the commission due to China Pearl.  The headwear produced under the fourteen sales contracts was shipped to ACI's customers.

### Delays in Payment

In May or June 2000, ACI began having cash flow problems that continued through 2001.  According to Schroeder, ACI was unable to stay current with all of its vendors and it was slow in making payments to China Pearl.  ACI became late in its payments to either China Pearl or Guang Dong, generally making payments over six months after a product had been shipped. Beginning in 2000, due to the delays in payment, Guang Dong often notified ACI that it would withhold shipment if at least partial payments were not made.  In a September 20, 2000 facsimile to Mr. Hua, the general manager at Guang Dong during the period of time ACI conducted business with the company, Davis stated that he understood "no payment, no shipment."  He stated further that he would "guarantee that ACI will do it's best to effect payment" on two

---

[3](Doc. 180, Ex. O.)

[4]One sales contract does not appear to be signed: No. 20RQK188, in the amount of $173.04.

different "CPI invoice[s]."

In December 2000, Davis sent Mr. Hua a number of emails addressing the delayed

payments.  On December 22, 2000, Davis wrote:

> Please continue to support our sales efforts and it will pay off for
> GDLHF in the near future.
> Please ship all the orders by the requested ship dates.
> Please trust ACI that we will get the payments made in due time.
> We have always paid GDLHF to help and trust ACI in order to
> bring in more customers and more cap business. . . .
> Please do your best to get your company to understand ACI will
> pay for everything you ship.[5]

On December 24, 2000, Davis wrote again:

> I do indeed understand the payment terms.
> ACI will do its best to pay GDLHF asap on all amounts due. . . .
> But you are correct, ACI must pay all the invoices and not look at
> any other aspects of doing business. . . .
> I appreciate all you have done for me these past 2 years.  I promise
> you today that I will rectify all the problems that I have caused you
> by the first of March, 2001.
> GDLHF will get ALL of their MONEY.
> ACI will make sure that GDLHF has everything that is due them
> asap,
> BEFORE
> We ask for any more production.[6]

Again, on December 28, 2000, Davis wrote that "GDLHF has ALWAYS been paid for each and

every shipment since the first orders in 1992. . . . Now is not the time to delay any shipments or

production. . . . I will 100% guarantee that ACI will pay GDLHF for all production in 2001."[7]

Mr. Hua sent a request for payment in writing to Davis at ACI on January 6, 2001 by

---

[5](Doc. 127, Ex. D-10.)

[6](Doc. 127, Ex. D-11.)

[7](Doc. 127, Ex. D-12.)

facsimile.  Mr. Hua wrote: "Pls check the above sheet then pay off USD123855.92 to CPI

Account.  Rebecca Yang will pay off GDLHF as soon as they get the money according to the

agreement between CPI and GDLHF."[8]  On January 13, 2001, Mr. Hua sent a facsimile to Davis,

expressing appreciation for the "receipt of over due [sic] amount over 40 thousand US dollars

from CPI Rebecca."  After explaining that Guang Dong was trying to ship out certain orders,

despite the lack of payment within 90 days of shipment on other orders, Mr. Hua again

emphasized the need for ACI to pay off the past due amount of USD80,000.[9]

On March 31, 2001, Mr. Hua sent another facsimile, along with an amount sheet, setting

forth the total amount due from ACI to Guang Dong in the amount of USD220006.17.  Mr. Hua

referenced a March 26 fax inquiring about overdue payments and asked Davis to please reply.

In this March 31 fax, Mr. Hua discussed Guang Dong's problems related to ACI's overdue

payments, including being fined for a delay in foreign exchange feedback and being "limited and

punished by the account comptroller."  Mr. Hua asked Davis to "keep your promises to wire out

due amounts on time. At least fax us a payment schedule."  The attached account sheet shows

amounts due to ACI based on shipment dates between August 10, 2000 and January 16, 2001.[10]

Davis responded to Mr. Hua's fax by email on March 31, 2001:

> I did indeed receive your fax of 3/26/01.
> I did not respond because I have nothing to say.
> I do indeed know exactly how much is owed to GDLHF by ACI.
> I have communicated that fact many times on an ongoing basis.
> I am and do intend to pay all outstanding amounts owed by ACI.
> I have explained again and again exactly what ACI was doing and

---

[8](Doc. 132, Ex. J.)

[9](Doc. 132, Ex. K.)

[10](Doc. 127, Ex. D-13.)

trying to do. . . .
Now as you know, ACI has had a very difficult time these past few
years.
ACI will, as I have proven for 17 years, always pay their bills.
ACI always has and always will.[11]

On April 12, 2001, Davis sent another email to Mr. Hua, stating, "I promised you I would keep

my promises to you, and I will.  I just don't have the money to pay to the factory right now, I am

doing my best, . . . It will take more time, and if some orders cancel, it will take even more and

more time than it would have, but, someday, I will keep my promises."[12]  ACI never paid Guang

Dong the amount it requested on the fourteen sales contracts that were exchanged between July

26, 2000 and January 9, 2001.

**_Joint Venture Agreement; Paramount and Cintas_**

For a number of years, Davis attempted to gain Paramount Headwear ("Paramount") as a

customer for ACI.  In 2000, Davis communicated with Jay Powell of Paramount about

conducting future business together.  In an October 9, 2000 email, Powell indicated to Davis that

"the credit factor becomes a huge issue for our company."  He further stated that "[i]f you can

accommodate some of my request on the credit front then I do think that I could immediately

start using your factories.  Of particular interest to me would be the Indonesian factories and the

current effects of China quota on your China factory."[13]  When ACI and Paramount began

contracting together, Powell indicated that he hoped it would develop into a long-term

relationship.  Paramount requested numerous price quotes from ACI for various upcoming

---

[11](Doc. 127, Ex. D-14.)

[12](Doc. 171, Ex. B. at 1–2.)

[13](Doc. 180, Ex. C.)

headwear programs.  In one email sent in December 2000, Powell asked for the cost on a hunting

cap shelf shipper.  He stated:

> For obvious reasons we do not expect to be able to start having
> you guys provide this service to us in the future because of freight
> cost but I want you to explore the actual cost for me to make the
> decision for future programs that you may get.  Thank you in
> advance for you [sic] efforts in this research.[14]

During the time that ACI and Guang Dong were communicating over past due amounts,

there was also some discussion between the parties about entering into a Joint Venture

Agreement.  At some point, a Joint Venture Agreement was drafted, providing that "GDLHF

will manufacture headwear which will be exclusively distributed and sold through ACI to

customers shown on Schedule A attached."  Schedule A identified the following companies:

Paramount Headwear, Inc., Best Manufacturing, Inc., and Ahead Headgear.  According to Davis,

the Joint Venture Agreement was intended to remove China Pearl from the relationship.

In the January 13, 2001 facsimile from Mr. Hua to Davis discussed earlier, Mr. Hua

explained that if ACI would pay the amount due, it would ship Cintas' order, referencing

PO#1901.  Mr. Hua then stated, with regard to a Paramount "PO" that:

> We insist this long-term chain business relationship:
> GDLHF—CPI—ACI—YOUR FINAL CUSTOMER. We are sure
> [sic] you we could not do business directly with ACI customers.
> Everything must be through ACI.  We care about ACI, protect ACI
> and hope ACI may tide over a difficult patch very soon. . . . We
> introduced some Hong Kong company, which have factory in
> Bangladesh, maybe they can help ACI.  After China enter WTO
> then quota cancelled, we can get back this order for the less price
> $3–4/doz.  So we have to give up Paramount order project.  I beg
> Mr. Chris can understand.[15]

---

[14](Doc. 180, Ex. I.)

[15](Doc. 132, Ex. K.)

On approximately February 19, 2001, ACI sent a number of purchase orders directly to Guang Dong for production of headwear for Paramount.  On this same day, ACI signed a sales contract with Guang Dong for the Paramount orders, which was substantially the same format and language as the fourteen sales contracts previously discussed and found in Doc. 127, Exs. D-2 and D-3.  Under this Paramount deal, ACI stood to receive $96,480 from Paramount, of which $70,380 was to be assigned to Guang Dong, leaving a profit to ACI of $26,100.  In the February 19 sales contract, Guang Dong represented that it would deliver ACI's headwear order to Paramount on or before March 31, 2001.

On February 22, 2001, Todd Johnson and Alex Levinson of Paramount met with Alex He[16] and Mr. Hua at Guang Dong's factory in China.  After touring the factory, Levinson sent an email to Alex He, and copied Davis on the message:

> Todd and I just wanted to thank you and Mr. Her [sic] for your hospitality today.  We enjoyed visiting you and seeing your plant.  We're confident you will make our current orders right and we'll have them by the 1st week of May.  After these go smoothly we can begin to look at working together more in the future.[17]

Levinson wrote other emails to Alex He with questions about pricing and sample caps.  In a February 27, 2001 email, Levinson discussed sample headwear that Paramount had requested from ACI and Guang Dong.  This email was also sent to an email address for "cpi," Alex He at an ACI email address and Cathy Murray and Davis at ACI.  In a March 23, 2001 email, Levinson asked Davis for price quotes on a number of different headwear products.  In addition

---

[16]Alex He was an employee of ACI from approximately February 2000 to April or May 2001.  Alex He is also Mr. Hua's son.  While he is a party to this action, the motions for partial summary judgment before the Court do not concern the claims by ACI against Alex He.

[17](Doc. 180, Ex. L.)

to Davis, Levinson copied Alex He at both his ACI and hotmail email addresses.

During these negotiations with Paramount, Davis continued to deal with requests for payment by Guang Dong on previously unpaid orders.  Davis received an email from Alex He on March 8, 2001, stating:

> As per Tina's idea, Rebecca & I talked to GDLHF couple times today.  Here is their options:
> 1) They require ACI to T/T $10K in 2-3 days (as deposit) and they will start the production for all in-hands orders once ACI arranges the $10K.
> 2) ACI has to T/T another more that $50K before factory ships the goods.  basically, GDLHF requires ACI to pay off the total amount (more than $60K) of the 40' container shipment which was shipped in August, 2000.  They don't need ACI to pre-pay those current in-hands orders and they don't accept Tina's idea.  If ACI can't pay $50K after the caps are done, they will keep the goods and won't ship out (even though that's stupid).
> . . . .
> Chris, in this case, the key issues concerned is payment term & ship date.  Please advise if you accept both the payment term & ship date factory suggested.  That is the best they can do for ACI.  If you accept, please arrange T/T of $10K urgently and arrange $50K before shipment.[18]

Davis responded to this email on March 12: "I accept the terms of the proposal for payment.  I will TT $10,000.00 this week.  I will accept that GDLHF will not ship any of the orders until they receive an additional$50,000.00 in TT payment.  The total will be $60,000.00."[19]  On March 19, 2001, ACI paid China Pearl $10,000.

On March 24, 2001, Mr. Hua wrote an email to Davis stating that

> Yesterday the corporation comptroller checked out account sheet and knew over 150 thousand US dollars we must get back from

---

[18](Doc. 127, Ex. E-2.)  Due to the volume of grammatical and spelling mistakes in the original of this email, the Court will not indicate each instance with a "[sic]" indication so as not to break the flow of the document.

[19](Doc. 127, Ex. E-1.)

aci.  Then the corporation president ordered us that we could not
ship goods anymore until aci pay off all the due amounts.  So we
have to make a statement that we can not start Paramount order
production until aci pay off all the due amounts.  Please note and
wire out money as soon as possible.[20]

On March 26, 2001, Mr. Hua sent Davis a fax stating that

ACI owed us usd229906.17, . . . Some of them usd81537.41 has
been delayed payment for over 3 months.  It is a very serious
account problem.  The group corporation strongly rebuke for our
situation.  So we are strongly announce that aci must pay off the
amounts which is delayed for over 3 months, that is usd81537.41.
AFTER receipt of this amounts, we start Paramount cap
production.[21]

Following this March 26 fax was a March 31, 2001 fax from Mr. Hua to Davis and a

March 31 email from Davis to Mr. Hua.  The Court has already discussed the content of this

correspondence as it relates to the past due amounts, but in his email to Mr. Hua, Davis also

discussed the Paramount orders:

But now, through the Paramount contracts, it is very easy to see
that Chinese do NOT keep their commitments.
I will not go into any details, I will not go into any rule of law in
the USA.
I have communicated my disappointment in GDLHF's broken
promises.
Three times in the last 3 months, GDLHF has made promises, in
writing, to ACI, and three times now, GDLHF has broken their
contracts and promises to ACI. . . . .Now, because GDLHF broke
their written promises to ACI, ACI and ACI's customers will
suffer many losses due to GDLHF's broken promises.
Mr. Hua, do not misunderstand me or my words, ACI helped
GDLHF when it was just a little factory doing 5 panel foam caps,
GDLHF has helped ACI. . . . ACI has been straight to GDLHF,
now it appears that GDLHF cannot keep it's [sic] promises it
makes to ACI.

---

[20](Doc. 132, Ex. R.)

[21](Doc. 132, Ex. S.)

11

This is a sad story for both of us.[22]

On April 13, 2001, Mr. Hua sent a facsimile to Davis stating that Guang Dong would begin production on the Paramount order after it received the $50,000 owed by ACI.  Mr. Hua then stated: "Then ship out goods after we receive usd21,637.41.  These total amounts usd71,637.41 is over-due for over 3 months.  Please wire out money in next week (Before Apr.20,2001).  Otherwise we will cancel this order.  Meanwhile, we reserve rights to get all over due amounts back."[23]  In order for Paramount to receive the headwear they had ordered through the sales contract between ACI and Guang Dong, Paramount was required to issue a purchase order to Guang Dong directly.  Davis provided Paramount with the contact information for Guang Dong and stated that "ACI will traffic and import the shipment from the factory dock in China to your dock door in Bourbon. . . . Your TT payment will go directly to Guangdong Light Headgear for the total amount of the Purchase Order and Invoice within 60 days after the date of the Ocean Bill of Lading from Guangzhou."[24]  Thereafter, Paramount and Guang Dong entered into a sales contract, dated April 17, 2001, that is substantially similar in form to the February 19 sales contract between ACI and Guang Dong.  Guang Dong refused to have further dealings with ACI after this point in time.

In June 2001, ACI offered to Paramount future business with two manufacturing options: retain Guang Dong with the understanding that they may decline to process more orders, or use a different factory that required a $100,000 standby letter of credit.  But ACI did not have the

---

[22](Doc. 127, Ex. D-14.)

[23](Doc. 171, Ex. C.)

[24](Doc. 127, Ex. D-27.)

12

financial ability to post the letter of credit required at this other production company.  Paramount did not enter into any subsequent contracts with ACI.  Likewise, ACI was not able to retain business with another customer—Cintas— after it was affected by the delays in shipment from Guang Dong.  One reason ACI was not able to retain Cintas' business is because it was not able to provide Cintas with open credit terms.

### Alex He and ATTA

Alex He, who is Mr. Hua's son, was employed by ACI during the period of time that the parties were negotiating the Joint Venture Agreement and he was working in China at the beginning of 2001.  While working for ACI, Alex He gained knowledge of Paramount, including its existence and location, along with such information as quote requests, sample requests, pricing, specification information, purchase orders, sales orders, and shipments.  In conjunction with his employment with ACI, Alex He signed a non-competition agreement that required him to refrain from dealing with ACI's manufacturers, vendors, and customer contacts that he may learned during the course of his employment for a period of not less than two years.[25]

Ultimately, Alex He returned to the United States and formed ATTA International, Inc. ("ATTA") in late-2001.  ATTA follows the same business model as ACI: it receives orders from its customers and sends the orders to a company such as Guang Dong for production.  Indeed, ATTA used Guang Dong to manufacture caps for its customers and ATTA acquired Paramount as a customer.  Paramount purchased a mid crown jockey cap from ATTA, the same style cap it had previously purchased from ACI.  Guang Dong offered ATTA a lower price for this cap than what it offered to ACI.  In offering this lower price, a Guang Dong representative reminded Alex

---

[25](Doc. 180, Ex. P.)

He of the "historic price info" of this style of cap.[26]  ACI's accounting expert, Steven Haenchen,

opined that ACI suffered lost profits from Paramount and Cintas in the amount of $3,402,436.

***Arbitration***

On July 19, 2001, Mr. Hua contacted Davis and advised that Guang Dong owed ACI

$29,700 from the Paramount order, for freight and handling fees.  Mr. Hua also advised Davis

that ACI still owed Guang Dong $220,006.17.  Mr. Hua sent Davis a facsimile on November 13,

2001 asking for the amount still owed and telling Davis that once the amount owed is paid,

Guang Dong would pay ACI its share of the Paramount order.  On December 4, 2001, Guang

Dong filed an application for arbitration with CIETAC, claiming that ACI had failed to pay

under the fourteen sales contracts.

On December 7, 2001, CIETAC sent to ACI: (1) a Notice of Arbitration requesting ACI

to select arbitrators and submit its statement of defense in time, (2) the Application for

Arbitration and accompanying annexes that had been filed by Guang Dong, (3) the Arbitration

Rules of the Arbitration Commission, and (4) a list of arbitrators.  By fax dated December 20,

2001, Guang Dong notified ACI of its selection of an arbitrator.  ACI never responded to Guang

Dong's fax.  Furthermore, ACI never made any election as to an arbitrator.  Subsequently,

CIETAC received a signed return receipt indicating that the documents had been received by

ACI on December 17, 2001.  During discovery, ACI produced a copy of the Notice of

Arbitration with a handwritten notation that it was received on December 17, 2001.

On January 15, 2002, a Notice on the Formation of Arbitration Tribunal Hearing

for Arbitration Case and Notice of the Hearing for Arbitration Case were mailed to ACI.

---

[26](Doc. 180, Ex. R.)

These documents were received by ACI on January 21, 2002.  An attorney-in-fact was appointed to represent ACI, and an arbitration panel heard the case by default.  ACI did not provide any statement to the arbitration panel during or after the hearing.  Guang Dong requested an award of $205,280.77 under the fourteen sales contracts for payments in arrears plus $12,109.73 in interest on that amount.  This request subsumed a previous ACI payment of $9,900 and a customs clearance fee of $29,700, which Guang Dong previously owed to ACI.

The arbitration panel's May 28, 2002 award found that Guang Dong satisfied its obligation for delivery of goods under the fourteen sales contracts.  It also determined that ACI violated articles 25 and 53 of the United Nations Convention on Contracts for the International Sales of Goods and would bear the liabilities for breach of contract.  The panel's decision awarded Guang Dong $205,280.77 in addition to $12,109.73 in interest.[27]  The decision also ordered ACI to pay an arbitration fee of RMB 73,973.00.

## II.   Procedural History

Guang Dong filed this action on August 2, 2003 to confirm the foreign arbitral award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") and 9 U.S.C. § 207.  ACI initially filed three counterclaims with its Answer—breach of contract, breach of the covenant of good faith and fair dealing, and equitable set-off—all dealing with the Joint Venture Agreement.

On May 10, 2005, this Court denied a motion by Guang Dong for summary judgment (Doc. 32).  The Court considered the legal significance of the sales contracts between ACI and Guang Dong and whether it had the authority to determine the validity of those contracts and

---

[27]Interest was calculated at the annual interest rates of 7.875% and 6.8125% on the basis of the respective amount on the sales contracts as of November 30, 2001.

thus, the arbitrability of the dispute.  The Court held that it could make this independent

determination.  However, the Court declined to grant summary judgment on the issue because

the "current record reflects a genuine issue of material fact [about] whether the parties reached

an agreement."[28]  The Court went on to address another argument made by ACI: that it did not

receive proper notice under the New York Convention.  After reviewing the record, the Court

found genuine issues of material fact about whether ACI was provided with adequate notice of

the proceeding, the appointment of the arbitrator, and whether it was provided with a reasonable

opportunity to present its case.  Finally, the Court found that there was a genuine issue of

material fact about whether the parties in fact executed a Joint Venture Agreement.[29]

After the Court denied Guang Dong's motion for summary judgment, the case proceeded

to discovery and ACI amended its Answer to add counterclaims and parties.  ACI added the

following counterclaims against Guang Dong: (1) fraudulent promise of future events; (2) fraud

(in the alternative); (3) breach of fiduciary duty; (4) tortious interference with contract; (5)

tortious interference with prospective business advantage or relationship; (6) breach of the

Kansas Uniform Trade Secrets Act; and (7) civil conspiracy.

### III.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[28](Doc. 32 at 17.)

[29]With regard to the Joint Venture Agreement, the Court also declined Guang Dong's request to find that the arbitration award applied to the Joint Venture Agreement in addition to the sales contracts.

of law."[30]  A fact is only material under this standard if a dispute over it would affect the

outcome of the suit.[31]  An issue is only genuine if it "is such that a reasonable jury could return a

verdict for the nonmoving party."[32]  The inquiry essentially determines if there is a need for trial,

or whether the evidence "is so one-sided that one party must prevail as a matter of law."[33]

The moving party bears the initial burden of providing the court with the basis for the

motion and identifying those portions of the record that show the absence of a genuine issue of

material fact.[34]  "A movant that will not bear the burden of persuasion at trial need not negate the

nonmovant's claim."[35]  The burden may be met by showing that there is no evidence to support

the nonmoving party's case.[36]  If this initial burden is met, the nonmovant must then "go beyond

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."[37]  When examining the

underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light

most favorable to the nonmoving party and that it may not make credibility determinations or

weigh the evidence.[38]

---

[30]Fed. R. Civ. P. 56(c).

[31]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[32]*Id.*

[33]*Id.* at 251–52.

[34]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[35]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[36]*Id.*

[37]*Id.*

[38]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

This Court has already considered and denied one motion for summary judgment by plaintiff.  Plaintiff re-filed a motion for partial summary judgment before ACI amended its Answer to add a number of new claims and two new parties—Alex He and ATTA.  Given the significant amount of amendments made in the Amended Answer and Counterclaim, and the new deadlines that were imposed in a September 2006 Scheduling Order, the Court denied Guang Dong's second motion for summary judgment without prejudice, explicitly declining to comment on the merits of the motion and stating that it sought "to prevent piecemeal resolution of the many issues and parties involved."[39]  Approximately two months after this Order, Guang Dong filed a third motion for partial summary judgment (Doc. 127), which addresses the confirmation action as well as seven of the ten counterclaims brought by ACI against Guang Dong.  In June 2007, Guang Dong filed another motion for partial summary judgment on the remaining three counterclaims brought against it by ACI (Doc. 170).

ACI argues that these latest summary judgment motions are an attempt by Guang Dong to re-hash the same arguments made in the first summary judgment motion, and argues that this Court should not alter its last ruling, denying summary judgment.  Certainly, the motions addressed in this Memorandum and Order would have been more easily processed by the Court had they been filed as one motion, rather than two.  However, the difficulty for the Court in considering these motions has as much to do with ACI's practice of filing two responsive documents to each motion as it is to the two sets of motions in general.[40]  While the Court agrees that parties should not pursue vexatious motions practice, the Court declines to find that this is

---

[39](Doc. 116 at 3.)

[40]*See* D. Kan. R. 7.1, 56.1.

Guang Dong's intent or purpose here.  Nor is the Court inclined to deny summary judgment again simply because it ruled over two years ago that it was appropriate based on the evidence in the record at the time.  Much time has passed since its May 10, 2005 Memorandum and Order and the Court intends to view the record as it exists today and not as it existed two years ago, when discovery was stayed.  Moreover, the currently pending summary judgment motions were filed after the Amended Answer and Counterclaim, which were not obviously addressed in the last rounds of summary judgment motions.  The Court declines to find that this constitutes a regurgitation of Guang Dong's past motions for summary judgment or that its past findings that there were genuine issues of material fact are binding.

**IV.     Discussion**

In its most recent summary judgment motions against ACI, Guang Dong contends that enough discovery has been produced to show no genuine issue of material fact about whether the arbitration award should be confirmed.  Second, Guang Dong argues that ACI is unable to show damages on any of its counterclaims, even assuming a Joint Venture Agreement was entered into by the parties.  On the trade secrets counterclaim, Guang Dong argues that ACI is unable to show a genuine issue of material fact about whether the allegedly misappropriated trade secrets were protectable.  The Court addresses each issue in turn.

**A.     *Confirmation of the Arbitration Award***

Guang Dong first asks the Court to grant summary judgment in its favor by confirming the CIETAC award.  In its May 10 Memorandum and Order Denying Plaintiff's Motion for Summary Judgment ("2005 Order"), the Court concluded that it had jurisdiction to consider this confirmation action under the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards ("New York Convention") and 9 U.S.C. § 207.[41]  However, the Court found a genuine issue of material fact existed regarding whether the parties had a meeting of the minds sufficient to form a contract when each of the sales contracts were signed, and whether ACI was given appropriate notice of the arbitration action.

Under the New York Convention, the Court may refuse to enforce an arbitral award only under the specific grounds set forth in article V.[42]  Article V provides the following five grounds of refusal to recognize and enforce an arbitral award: (1) the parties to the agreement were under some incapacity or the agreement is not valid under the laws the parties have subjected it to; (2) the party against whom the award was invoked did not receive proper notice; (3) the award contains decisions on matters outside the scope of the arbitration agreement; (4) the composition of the arbitral authority was not in line with the agreement of the parties or was not in line with the law under which the award was made; and (5) the award is not binding on the parties, or it has been set aside by a competent authority in the country where the award was made.[43]

In addition, refusal may be appropriate if the authority in the country where confirmation is sought finds that: (1) the subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (2) confirming the award would be contrary to the public policy of that country.[44]  ACI bears the burden of proving that the Court should refuse to

---

[41]The Court's holding was specific to confirmation of the award with respect to the fourteen sales contracts between the parties.  The Court was clear that, to the extent Guang Dong sought to adjudicate the rights and obligations of the parties under any joint venture agreement that may have existed, the arbitration award did not apply.  (Doc. 32 at 10.)

[42]9 U.S.C. § 207; New York Convention, art. V; *see, e.g.*, *Encyclopaedia Unversalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).

[43]New York Convention, art. V.

[44]*Id.*

enforce the award under one of these grounds.[45]

> The burden is a heavy one, as 'the showing required to avoid
> summary confirmance is high.' . . . Given the strong public policy
> in favor of international arbitration, review of arbitral awards
> under the New York Convention "is very limited in order to avoid
> undermining the twin goals of arbitration, namely, settling disputes
> efficiently and avoiding long and expensive litigation."[46]

The Court previously decided that it must make an independent determination of the sales

contracts' validity and thus, the arbitrability of the dispute.  At the time of the 2005 Order, the

Court found there was a genuine issue of material fact on that question.  Now that extensive

discovery has been conducted by the parties, ACI argues that there still exists a genuine issue of

material fact about whether the parties had a direct contractual relationship that rendered the

sales contracts enforceable, and thus, arbitrable.[47]

 The parties appear to agree that the United Nations Convention on Contracts for the

International Sale of Goods ("CISG") governs this matter.[48]  The CISG only deals with the

formation of the contract for sale and with the rights and obligations of the buyer and seller.[49]

---

[45]*Encyclopaedia Britannica*, 403 F.3d at 90; *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak*, 364 F.3d 274, 288 (5th Cir. 2004); *Czarina ex rel. Halvanon Ins. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292–93 n.3 (11th Cir. 2004).  Because Guang Dong, as the movant, does not bear the burden of proof, it will be sufficient for Guang Dong to show a lack of evidence in support of ACI's contention that summary confirmance is not appropriate.

[46]*Encyclopaedia Britannica*, 403 F.3d at 90 (citations omitted) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)), *cert. denied*, 522 U.S. 1111 (1998)).

[47]ACI does not pursue its prior argument that notice was insufficient under the New York Convention in its response memorandum (Doc. 133).

[48]15 U.S.C. app. [hereinafter "CISG"].  The CISG applies to contracts for the sale of goods when the parties' places of business are in different States and the States are contracting States.  CISG art. 1(1)(a).  Both China and the United States are parties to the Convention.

[49]*Id.* art. 4.

The CISG does not concern itself with the validity of the contract or any of its provisions.[50]  ACI

argues that no contract was formed between itself and Guang Dong when it signed the sales

contracts at issue.  Article 8 of the CISG provides:

> (1) For the purposes of this Convention statements made by and
> other conduct of a party are to be interpreted according to his
> intent where the other party knew or could not have been unaware
> what that intent was.

> (2) If the preceding paragraph is not applicable, statements made
> by and conduct of a party are to be interpreted according to the
> understanding a reasonable person of the same kind as the other
> party would have had in the same circumstances.

> (3) In determining the intent of a party or the understanding a
> reasonable person would have had, due consideration is to be
> given to all relevant circumstances of the case including the
> negotiations, any practices which the parties have established
> between themselves, usages and any subsequent conduct of the
> parties.[51]

The plain language of the CISG requires the Court to evaluate a party's subjective intent, so long

as the other party was aware of that intent.  Otherwise, paragraph two of article 8 applies.[52]  ACI

argues that despite the plain language of the sales contracts, the subjective intent of the parties

was to treat these forms as mere confirmations of orders between ACI and China Pearl.

ACI argues that its subjective intent was to treat the sales contracts as confirmations and

that it only intended to contract directly with China Pearl.  But ACI comes forward with no

evidence that Guang Dong knew of its subjective intent.  The evidence cited by both parties on

---

[50]*Id.*

[51]*Id.* art. 8.

[52]*MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1388 n.11  (11th
Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999) (explaining that only evidence of the other party's knowledge of
subjective intent allows a case to fall within article 8(1) instead of 8(2)).

this issue is the deposition testimony of Guang Dong's corporate representative, where he was

asked if he ever told ACI that Guang Dong was going to require it to contract directly with it in

1999.

> A.    Somebody has, you know, talked to ACI and, otherwise, they wouldn't sign the sales contract back to us.
>
> Q.    Well, had you ever heard that ACI signed the sales contract to verify quantities of product?
>
> A.    That's not our knowledge, what we think is, this is a sales contract, it's—it's a contract, not just a verification.
>
> Q.    Okay.  So who, at Guang Dong, communicated to ACI that they were going to have to start signing sales contracts in 1999 and that the whole relationship was going to be changed from where it had been for the previous seven. years?
>
> A.    That, I don't know.
>
> Q.    Okay.  But it wasn't you?
>
> A.    It wasn't me.[53]

While this testimony may be evidence that ACI was never informed directly about the change in

procedure in 1999, it provides no evidence that Guang Dong was aware of this fact, or that it was

aware that ACI was treating the sales contracts as verifications.  To the contrary, this evidence

shows a lack of knowledge on the part of Guang Dong of ACI's subjective intent.  Further, ACI

comes forward with no other evidence that Guang Dong agreed or acknowledged that these

forms were mere confirmations of orders.  Because there is no other evidence that Guang Dong

was aware that ACI was treating these forms as verifications, article 8(1) is not applicable.

Because the Court is confined to Article 8(2) of the CSIG, it is to look at the objective

evidence of the parties' intent.  In other words, the Court must consider whether ACI's actions

made its subjective intent to treat the sales contracts as mere verifications known to the

understanding of a reasonable person of the same kind as the other party (i.e., Guang Dong) in

---

[53](Doc. 127, Ex. A-1 at 226.)

the same circumstances.

First, ACI argues that although its credit terms were extended to ninety days in 1999, the substance of the relationship between ACI and Guang Dong did not change.  ACI insists that it continued to contract with China Pearl and not Guang Dong for the sale of headwear, even after the credit terms were extended.  In support of this contention, ACI points to the fact that it continued to send purchase orders directly to China Pearl after January 1999 and that it received an invoice from China Pearl after an order was completed by Guang Dong.  ACI also points the Court to a December 1998 sales contract that is substantially similar to those involved in the arbitration and lists Guang Dong as the seller and ACI as the buyer, where Guang Dong asks ACI to confirm, sign, and fax back an order, and includes a credit term of thirty days.  Guang Dong contends that the December 1998 sales contract was formed at the beginning of the period when ACI and Guang Dong began contracting directly with one another, and is not evidence that these sales contracts were historically and routinely passed between the parties as mere confirmations.

According to Guang Dong, a direct contractual relationship between itself and ACI was necessary in order to accommodate the increase in credit terms and China Pearl was simply an intermediary between the parties.  Guang Dong concedes that both before and after the credit terms changed, China Pearl provided services such as receiving purchase orders, inspecting product, and handling shipping and invoicing.  Guang Dong contends that before the end of 1998, Guang Dong's sales contracts were addressed to China Pearl, whereas after the end of 1998 or the beginning of 1999, Guang Dong began contracting directly with ACI.

An example of an old sales contract between ACI and China Pearl[54] substantiates both parties' contention that, at one time, the two companies contracted directly for the sale of headwear.  But ACI points this Court to no other evidence of past sales contracts between itself and China Pearl.  What does exist in the record are many sales contracts between Guang Dong and ACI beginning in December 1998 that are identical in form to the fourteen sales contracts at issue in the arbitration.  These contracts list Guang Dong as the seller and ACI as the buyer, contain price terms and quantities, credit terms, and arbitration clause, and the signatures of both parties.

Viewed in the light most favorable to ACI, the evidence in the record shows that it was misled by Guang Dong because although the sales contracts stated that they were between ACI and Guang Dong, they were forwarded by China Pearl, as they had been prior to the change in credit terms.  Therefore, ACI believed it was contracting with China Pearl.  The Court does not find this contention sufficient to create a genuine issue of material fact about whether the parties formed a contract.  Such a contention requires this Court to assume that the ACI representatives did not read the sales contracts before signing them.  For if they had read the contracts, it would be obvious to them that they constituted direct contracts between themselves and Guang Dong, and that they did not mention China Pearl.  It is an elemental principle of contract law that "parties who sign contracts will be bound by them regardless of whether they have read them or understood them."[55]  "We live in a global economy and contracts between parties of different nationalities, and speaking different languages, are commonplace.  But a party who agrees to

---

[54](Doc. 127, Ex. D-130.)

[55]*MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*  144 F.3d 1384, 1387 n.9  (11th Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999).

terms in writing without understanding or investigating those terms does so at his own peril."[56]

Moreover, the weight of evidence about the parties' conduct shows that they were in a direct contractual relationship. Importantly, there are numerous communications between representatives of ACI and Guang Dong regarding money owed by ACI to Guang Dong on these contracts. In all of the communications between Davis and Mr. Hua, Davis explicitly acknowledged that ACI owed Guang Dong payment for headwear orders that Guang Dong had produced and shipped pursuant to sales contracts. Despite ACI's current position that it was not contracting with Guang Dong at the time, Davis made no reference in the emails to the fact that he believed he owed China Pearl, and not Guang Dong payment.

There are some references in the emails to Davis paying China Pearl the past due amounts. In particular, Mr. Hua asked Davis in a January 6, 2001 request for payment to please "pay . . . to CPI Account. Rebecca Yang will pay off GDLHF as soon as they get the money according to agreement between CPI and GDLHF." While this indicates that CPI was used as some sort of intermediary for payment, it does not create an issue of material fact about whether there was a contractual relationship between ACI and Guang Dong. Likewise, the sales contracts including commission payments to China Pearl would not negate the essential contractual relationship between ACI and Guang Dong established by the sales contracts. There is no indication that any overpayment to Guang Dong or China Pearl would go toward this sales commission had it ever been paid. And Davis never disagreed or disputed the amounts Mr. Hua

---

[56]*Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992); *see also Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003); *Proin S.A. v. Lasalle Bank, N.A.*, 223 F. Supp. 2d 960, 964–65 (N.D. Ill. 2002).

demanded for payment on the sales contracts.[57]

The Court finds that the objective evidence of ACI's intent—the statements and conduct of ACI—could not be interpreted by a reasonable person in Guang Dong's position to be that the sales contracts constituted mere verifications of orders.  The statements and conduct of ACI overwhelmingly indicate an intent to be bound by those contracts; an understanding that ACI owed Guang Dong payment for headwear orders that it produced for ACI's customers.  While there is certainly evidence of a past contractual relationship between ACI and China Pearl, who would then contract with Guang Dong, there is no such evidence of this relationship extending past late 1998 aside from Davis' assertions.  Instead, the evidence—the contracts themselves and the objective evidence of the parties' intent—shows a contractual relationship between ACI and Guang Dong, which included an agreement to arbitrate.  Accordingly, the Court finds that ACI is unable to come forward with evidence to show that there was no meeting of the minds when the parties signed the fourteen sales contracts that were the subject of the CIETAC arbitration.  Because this is the only ground upon which ACI challenges the confirmation of this award, the Court grants Guang Dong's motion for summary judgment and confirms the arbitral award by CIETAC.

### B.  ACI's Counterclaims

ACI's counterclaims against ACI stem from either Guang Dong's alleged breach of the Joint Venture Agreement, or from the conduct of Alex He, ATTA, and Guang Dong during and subsequent to the alleged Joint Venture Agreement with Guang Dong.  Guang Dong argues that summary judgment on all of these claims is warranted because ACI is unable to show damages.

---

[57]While not argued by the parties, the Court also notes that the Notice of Nondisclosure form that Guang Dong signed in August 2000 indicated explicitly that the parties considered Guang Dong to be "under contract" with ACI.  (Doc. 180, Ex. O.)

The Court will first address all counterclaims except for Counterclaim X.  Guang Dong's position on all of these claims is that the Joint Venture Agreement was terminated by the parties' conduct and that ACI's claim of lost profits is not tenable.  The Court will then address Guang Dong's argument that summary judgment is proper on Counterclaim X, the Kansas Uniform Trade Secrets Act claim.

### 1.   Counterclaims Related to the Joint Venture Agreement;[58] Lost Profits

Guang Dong argues that summary judgment should be granted on each of the counterclaims that relate to the Joint Venture Agreement and/or Paramount order because ACI cannot show damages, an essential element of each of those claims.  Guang Dong states in its briefs that it will assume the formation of the Joint Venture Agreement for the limited purpose of summary judgment, without waiving it's position that it was never formed.  Therefore, the Court assumes without deciding the existence of a Joint Venture Agreement between the parties and only decides whether ACI has come forward with evidence to show it suffered damages as a result of Guang Dong's conduct after this agreement was formed.

ACI contends in these counterclaims that Guang Dong had a duty under the Joint Venture Agreement to fill an order for Paramount that would ship by March 31, 2001.  But Guang Dong

---

[58]In its response memorandum, ACI for the first time asserts that its breach of contract counterclaim is also "based on [Guang Dong's] breach of the Notice of Nondisclosure of Proprietary and Confidential Information as well as its improper conduct in sabotaging ACI's business and then working with Alex He and ATTA International to create new business relationships with ACI's lost customers."  (Doc. 133 at 21); *see* Doc. 180, Ex. O.  The Court declines to consider this argument, as it is not included in the Pretrial Order.  The Pretrial Order sets forth ACI's theories of recovery on its counterclaims and states that they are based on Guang Dong's conduct with regard to either the Joint Venture Agreement or the Paramount sales contract.  (Doc. 173 at 22–24.)  The Pretrial Order "'measures the dimensions of the lawsuit,' and 'control[s] the subsequent course of the action unless modified by a subsequent order.'" *Shaub v. Newton Wall Co/UCAC*, 153 F. App'x 461, 464 (10th Cir. 2005) (quoting *Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991)); Fed. R. Civ. P. 16(e)).  The Pretrial Order was entered after ACI submitted its first response to the partial summary judgment motion, so it certainly should have been included as a distinctly different theory of recovery from those regarding the Joint Venture Agreement.  ACI's response to the second partial summary judgment motion was filed after the Pretrial Order was filed.  Nonetheless, the Court fails to see how this argument is material to the question of whether ACI can show lost profits due to the conduct of Guang Dong alleged in the counterclaims.

ultimately refused to fill this order by the March 31, 2001 deadline.  As a result of Guang Dong's refusal to fill this order, ACI maintains that it suffered lost profits of approximately $2.7 million. In support of this figure, ACI primarily relies on an expert report prepared by Steven Haenchen, which estimates the damages due to ACI's loss of both Paramount and Cintas as customers. ACI's lost profits argument alleges that Guang Dong intentionally entered into the Joint Venture Agreement with ACI in order to create leverage to obtain payment on outstanding debts owed by ACI.  ACI argues that Guang Dong sabotaged its relationship with Paramount, causing it to lose a considerable amount of money that it had contemplated making when the parties entered into the Joint Venture Agreement.

First, Guang Dong argues that, assuming the existence of the Joint Venture Agreement,[59] it was properly terminated by the parties' conduct, and therefore, ACI is not entitled to lost profits because it was terminated before any profits accrued.  A contract may be terminated by agreement of the parties under the CISG.[60]  More importantly, the Joint Venture Agreement provides that it "may be modified or amended by mutual agreement of the parties hereto."[61] Therefore, the Court must determine whether there is a genuine issue of material fact about whether the contract was properly terminated in line with the provision in the agreement.  The Court is not persuaded by Guang Dong's argument that the parties' conduct terminated the Joint Venture Agreement.  It is uncontroverted that the parties were in conflict over the Paramount

---

[59]Throughout the remainder of this Memorandum and Order, the Court will reference the Joint Venture Agreement as if it had been formed, based on the arguments by Guang Dong that subsume contract formation.  In doing this, the Court in no way implies or suggests that Guang Dong has waived its argument that the Joint Venture Agreement was never formed in the first instance.

[60]CISG art. 29;

[61](Doc. 127, Ex. D-23.)

29

sales contract, which had a negotiated shipment date of March 31, 2001.  It is also uncontroverted that Guang Dong refused to ship the Paramount order pursuant to this sales contract because of past due amounts on other contracts not affiliated with the Joint Venture Agreement.  As a result of this conflict, ACI was forced to allow Paramount to contract directly with Guang Dong in order to receive its shipment.  After this sales contract fell through, Guang Dong refused to enter into further deals with ACI.

The Court fails to see how this series of events could constitute an "agreement" to terminate the Joint Venture Agreement.  At best, this conduct evidences an agreement to terminate the Paramount sales contract.  Accordingly, the Court finds there exists a genuine issue of material fact about whether the Joint Venture Agreement was terminated by mutual agreement of the parties according to the terms of that agreement.

The Court next considers whether ACI could have suffered lost profits as a result of Guang Dong's alleged conduct.  To show lost profits, ACI must show the future profits with reasonable certainty and that they were reasonably considered to have been within the contemplation of the parties.[62]  "Recovery for loss of profits . . . depends upon the facts and circumstances of each particular case."[63]  According to Guang Dong, ACI was unable to procure future business with Paramount and Cintas because it could not provide these customers with open credit terms.  ACI contends that but for Guang Dong's breach of the Joint Venture Agreement and delays in shipments, ACI had a reasonable prospect of future business with Paramount.

There is some evidence in the record that ACI could have enjoyed future sales of

---

[62]*Vickers v. Wichita St. Univ.*, 518 P.2d 512, 515 (Kan. 1974).

[63]*Id.*

30

headwear with Paramount had the initial sales contract been executed as contemplated. Specifically, there is a lack of evidence that Paramount withdrew its business from ACI solely because of the lack of open credit terms. While Davis admitted during his deposition testimony that the lack of open credit terms was one reason why Paramount and Cintas declined to continue placing orders through ACI, there is no evidence to suggest that the repeated delays in shipment did not also influence that decision. Moreover, there is correspondence between a representative at Paramount and Davis, prior to the execution of the sales contract, that establishes that Paramount was considering sending more business in ACI's direction had that transaction been successful.

While couched in terms of a damages argument, Guang Dong essentially argues causation, that any damages occurred only because of ACI's financial difficulties. But if the Court views ACI's claims as true—that Guang Dong induced it into signing the Joint Venture Agreement, only to use the Paramount deal as a bargaining chip to collect preexisting debt and then refuse to honor agreement—then there is a genuine issue of material fact about whether these actions caused ACI's lost profits with Paramount and Cintas.[64] For if these allegations are true,[65] then ACI's inability to obtain open credit with any factory, including Guang Dong, was proximately caused by the conduct giving rise to the counterclaims. To be sure, the issue goes to the nature of the Joint Venture Agreement itself, and the rights and obligations, if any, that

---

[64]There is a serious dispute between the parties about whether Guang Dong entered into the Joint Venture Agreement merely as a bargaining chip to collect past due debt from ACI. The evidence on this point turns on the deposition testimony of Bert Ruiwen, Guang Dong's corporate representative. Although he answered "yes" to the question, "So you were going to proceed with this order as a negotiation chip to use with ACI, is that your testimony," he later corrected this answer to "no," in an errata sheet. *See* Doc. 132, Ex. A-3 at 136; Doc. 135, Ex. A. The Court declines to address this disputed testimony at this time, as it is not material to the argument that any alleged conduct by Guang Dong did not cause ACI's lost profits damages.

[65]None of the elements of the counterclaims, other than the trade secrets claim, are at issue in this summary judgment motion except for the damages elements.

Guang Dong owed ACI if it did enter into this agreement.  Because a genuine issue of material

fact exists on all of the counterclaims tied to this agreement, the Court declines to enter summary

judgment based on Guang Dong's argument that its conduct could not have cause ACI's lost

profits damages.

     **2.**       **Trade Secrets Claim**

     ACI's tenth counterclaim asserts that Guang Dong breached the Kansas Uniform Trade

Secrets Act ("KUTSA") by using a trade secret without the express or implied consent of ACI,

knowing that it had been acquired under circumstances giving rise to a duty to maintain its

secrecy or limit its use.  Under the KUTSA, a trade secret means,

> information, including a formula, pattern, compilation, program,
> device, method, technique, or process, that:
> (I) derives independent economic value, actual or potential, from
> not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value
> from its disclosure or use, and
> (ii) is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.[66]

The existence of a trade secret under the KUTSA is a question of fact.[67]  The proponent of the

claim must come forward with some evidence showing that the information alleged to be a trade

secret meets the definition.[68]

> This burden is not met by general allegations; rather, it must be
> met by describing "the subject matter of their trade secrets in
> sufficient detail to establish each element of a trade secret."  *Id.*
> Plaintiff has the burden under the KUTSA to define its trade

---

[66]K.S.A. § 66-3320(4).

[67]*See, e.g.*, *Bradbury v. Teissier-Ducros*, 413 F. Supp. 2d 1209, 1221 (D. Kan. 2006); *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004); *BioCORE, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221, 1224 (D. Kan. 2000), *aff'd in part & rev'd in part*, 80 F. App'x 619 (10th Cir. 2003).

[68]*Bradbury*, 413 F. Supp. 2d at 1221.

secrets with the precision and particularity necessary to separate it
from the general skill and knowledge possessed by others.[69]

Guang Dong first argues that ACI does not meet its burden to identify or define its trade secrets with particularity.  According to Guang Dong, the evidence only shows that the information alleged to be trade secrets is general business information and/or constitute general skill and knowledge by others that is general and public information.[70]

During his deposition, Davis identified the following as ACI trade secrets: "costing, pricing, customer schedules, product information, product specifications, factory cost information as it relates to the final product cost to the customer, customer relations," and the semantics of business operations and relations.  ACI points to the non-competition agreements and non-disclosure agreements that it entered into with its employees and to the non-disclosure covenants it entered into with its vendors as evidence that it attempted to guard this information and  maintain its secrecy.  According to ACI, if its pricing information became widely known, competitors could price ACI out of business by underbidding to its customers, which occurred when Guang Dong offered a better price to ATTA for Paramount headwear than it had previously offered to ACI.

Specifically, ACI points to its pricing structure, product development and profitability that Guang Dong learned through documents such as the sales contracts that were the subject of the arbitration dispute.  These documents, according to ACI, contained the prices that ACI

---

[69]*Id.* at 1222 (quoting *BioCORE*, 96 F. Supp. 2d at 1231).

[70]The parties discuss in the response and reply briefs whether the definition of "misappropriation" was met. But this was not an argument raised in Guang Dong's motion.  Instead, it was raised for the first time in ACI's response.  In considering the trade secrets claim, the Court only considers whether the information at issue constitutes trade secrets and whether any alleged misappropriation caused ACI's damages.  Because ACI raised the issue for the first time in the response brief, Guang Dong, as the moving party necessarily discusses it for the first time in the reply brief.  Of course, the Court does not consider arguments raised for the first time in a reply brief. *See, e.g.*, *Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772, 788 (10th Cir. 2007).

ultimately charged its customers, rather than the price that it paid for the products.  Next, ACI points to the sample caps that it helped develop with Guang Dong for Paramount, before the February 2001 sales contract fell through.  ACI argues that Guang Dong used this product information to establish a business relationship with Paramount, which allowed Paramount to buy the same caps through ATTA that ACI had helped develop with Guang Dong.  ACI points to the non-disclosure covenant that Guang Dong signed that required them to maintain confidentiality with respect to this information.

Guang Dong complains that ACI only identifies general business information, which is based on conclusory allegations by Davis.  Guang Dong insists that "the plaintiff[] must describe the subject matter of their alleged trade secrets in sufficient detail to establish each element of a trade secret,"[71] and that ACI has not done so here.  "Detailed records . . . regarding such information as purchasing patterns, sales volumes and payment histories may be a trade secret."[72] This is exactly the type of trade secret that ACI alleges Guang Dong misappropriated. According to Guang Dong, this information was used to provide an advantage to Alex He and ATTA in bidding on Paramount's products.  Specifically, Paramount purchased a mid crown jockey cap from ATTA, the same style cap it had previously purchased from ACI.  Guang Dong offered ATTA a lower price for this cap than what it offered to ACI.  In offering this lower price, a Guang Dong representative reminded Alex He of the "historic price info" of this style of cap. The Court finds that ACI has come forward and identified specific trade secrets that were allegedly misappropriated by Guang Dong.

Next, Guang Dong argues that ACI only alleges trade secrets that are nothing more than

---

[71]*Dodson*, 347 F. Supp. 2d at 1010.

[72]*Id.* (quoting *BioCORE, Inc.*, 96 F. Supp. 2d at 1235).

34

the general skill and knowledge possessed by others.  According to Guang Dong, the information alleged to have been misappropriated was information that Alex He learned during his employment with ACI.  Guang Dong cites authority for the proposition that an employee cannot be forced to erase from his mind all of the general skills, knowledge, and acquaintances that he developed.[73]  But the trade secrets claim does not rely solely on information Alex He provided to Guang Dong, but also on the information Guang Dong learned through its status as ACI's vendor.  While Guang Dong repeatedly claims the pricing and product information was general and public, it points the Court to no evidence of this.  ACI meets its burden of coming forward with evidence, specifically the non-disclosure covenant, that would allow a reasonable trier of fact to conclude that the information was not generally available to the public.

Finally, similar to its argument on the other counterclaims, Guang Dong argues that ACI suffered no lost profits, even assuming that misappropriation of a trade secret did occur.  For the same reasons discussed above, the Court finds that ACI has come forward with evidence tending to show that it was not solely responsible for the loss of Paramount and Cintas as customers. Viewing all reasonable inferences in the light most favorable to ACI, the conduct giving rise to the counterclaims caused ACI to lose Guang Dong as a vendor and, thus, to lose Paramount and Cintas as customers.

**IT IS THEREFORE ORDERED BY THE COURT** that Guang Dong's Motion for Partial Summary Judgment (Doc. 126) is granted in part and denied in part.  The motion is granted on Guang Dong's motion to confirm the foreign arbitral award and is denied on ACI's counterclaims.  Guang Dong's Motion for Partial Summary Judgment on ACI's Counterclaim

---

[73]*See Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 988 (C.D. Ill. 2003).

Counts XI, XII, and XIII (Doc. 170) is denied.

**IT IS SO ORDERED**.

Dated this 28<u>th</u> day of September 2007

<u>  S/ Julie A. Robinson        </u>
Julie A. Robinson
United States District Judge