ams
# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Guang Dong Light Headgear Factory Co., Ltd.,<br><br>              Plaintiff,<br><br>vs.<br><br>ACI International, Inc.,<br><br>              Defendant.<br><br>ACI International, Inc.,<br><br>              Counterclaim<br>              Plaintiff,<br><br>vs.<br><br>Guang Dong Light Headgear Factory Co., Ltd., Alex He, and ATTA International, Inc.,<br><br>              Counterclaim<br>              Defendants. | Case No. 03-4165-JAR |

## **MEMORANDUM AND ORDER**

The Court now considers the Motion in Limine to Exclude Testimony of ACI Expert Steven Haenchen by counterclaim defendants Alex He and ATTA International, Inc. ("ATTA") (Doc. 211) and Motion for Joinder by counterclaim defendant Guang Dong Light Headgear Factory Co., Ltd. ("Guang Dong") (Doc. 213). On January 10, 2008, the parties advised the Court that counterclaim plaintiff ACI International, Inc. had reached a settlement of its claims against Alex He and ATTA; therefore, only the counterclaims against Guang Dong remain.

Nonetheless, the Court considers Alex He and ATTA's motion in limine to the extent it implicates the remaining counterclaims against Guang Dong and determines whether the expert testimony offered by ACI is admissible under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals., Inc*,[1] and *Kumho Tire Co. v. Carmichael*.[2]

## I.     Background

The Court has written a multitude of dispositive orders in this case that set forth the extensive factual background of the claims. The Court incorporates this factual background to the extent it is relevant to the instant motion. ACI seeks damages in the form of lost profits. Specifically, ACI seeks lost profits based on the loss of business from its former customer, Paramount.

ACI retained Steven Haenchen, a certified public accountant, to calculate its lost profits. Haenchen initially completed an expert report on January 3, 2006, finding $804,650 in lost profits based on ACI's original claims against Guang Dong. Since that time, Alex He and ATTA were added as parties along with various counterclaims. Accordingly, Haenchen revised his report based on additional information acquired by ACI during discovery and based on the additional claims asserted against Guang Dong and the other counterclaim defendants. Based on his revised report, ACI seeks approximately $2,393,026 in lost profits due to the loss of business from Paramount.[3]

---

[1] 509 U.S. 579 (1993). The parties have also informed the Court that ACI is no longer seeking lost profits based on its business with Cintas Corporation, as originally set forth in the pretrial order. Therefore, the Court deems moot the portion of the supplemental brief filed by Guang Dong dealing with this aspect of Haenchen's report.

[2] 526 U.S. 137 (1999).

[3] *See* Doc. 212, Ex. 2 at 265–66 (calculating lost profits excluding Cintas calculation).

Haenchen was deposed on March 23, 2007, and his testimony is attached as Exhibit 2 to the Motion in Limine.[4]  Guang Dong seeks to exclude Haenchen's testimony, arguing that he is not qualified to opine about damages relating to the headwear industry and that his testimony is unreliable  because it is speculative and relies upon unsupported assumptions or methodology.

**II.     Standard**

The Court has broad discretion in deciding whether to admit expert testimony.[5]  Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[6]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[7]  In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[8]

---

[4](Doc. 212, Ex. 2.)

[5]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[6]Fed. R. Evid. 702.

[7]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[8]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).

Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[9] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[10] And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[11]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[12] But "the gatekeeping inquiry must be tied to the facts of a particular case."[13]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[14] The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[15] In this case, the parties have agreed that a hearing is not necessary, and have rested on their written submissions. The Court

---

[9] *Id.* (quoting *Daubert*, 509 U.S. at 597).

[10] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[11] *Id.*

[12] *Daubert*, 509 U.S. at 593–94.

[13] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[14] *Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[15] *Id.*

has carefully reviewed the exhibits filed with the motion and believes this review is sufficient to render a decision on the motion to exclude without conducting an oral hearing.

**III.   Discussion**

   *A.   Haenchen's Knowledge of the Headwear Industry*

In its supplemental brief, Guang Dong argues that Haenchen is unqualified to render an expert opinion about lost profits in the headwear industry due to his unfamiliarity with the industry. Guang Dong cites Haenchen's deposition testimony acknowledging that he did not know whether the industry was a high growth industry, how mature the market is in which ACI competes, who the major distributors in the United States are, how ACI compares to its competitors, or the process in which vendors are selected.

To qualify as an expert, Haenchen must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."[16] A witness's lack of specialization does not affect the admissibility of the opinion, only the weight.[17] Haenchen is a Certified Public Accountant who is accredited in Business Valuation by the American Institute of Certified Public Accountants. His curriculum vitae is attached to the report, as well as a list of other lawsuits in which he has provided expert testimony. Haenchen owns the business for which he works and was previously employed for over ten years in the field of public accounting. Haenchen testified that he has worked in the field of forensic accounting litigation support for about seven years. In rendering an opinion on lost profits in this case, Haenchen reviewed a

---

[16]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quotation omitted).

[17]*First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078 (D. Kan. 2000) (citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

number of documents provided to him by ACI, which are listed in attachments to each report. Haenchen testified that he also relied upon his own knowledge of damage calculation that he has learned through reading books and attending seminars on the subject matter. The Court finds that Haenchen is qualified to testify on the matter of how to calculate lost profits damages in this case. Guang Dong's arguments about Haenchen's qualifications go to the weight and not the admissibility of his testimony, as they only comment on his lack of specific knowledge about the headwear industry and the particular parties involved in this litigation.

### B.     *Assumptions Made in the Report*

Guang Dong asserts, through its joinder of Alex He and ATTA's motion, that Haenchen's report is unreliable because it is based on the following faulty assumptions: (1) ACI would have received 50% of the headwear business referenced in Jay Powell's email;[18] (2) ACI would have received 100% of the orders Paramount has placed with ATTA; (3) growth of business between ACI and Paramount would have been about $1 million each year from 2003 to 2009; and (4) ACI's business with Paramount would have extended until 2009.

#### 1.     **Reliance on the Powell Email**

Haenchen relied on an email from Jay Powell of Paramount in support of the contention that ACI could have expected more business from Paramount if the initial order in late 2000 had been delivered on time and if Paramount did not have to contract directly with Guang Dong in order to secure delivery. The email was from Jay Powell to himself and "B.H.PARK," asking for a price quote on three different items. The email included a quantity range and target price for each item and states: "offer your best price and then also tell me what changes can be made

---

[18]*See* Doc. 212, Ex. 3.

to allow me to get to my target prices." Extrapolating from the figures in this email, Haenchen assumes that ACI would have received one-half of this business by selling to Paramount for the target prices, resulting in 50% of $894,000 to $1,080,000 per year.

First, Guang Dong argues that the decision to figure potential sales based on 50% of the sales discussed in this email is subjective speculation and is not based on a methodology supported in the accounting community. In his deposition, Haenchen testified as follows about his decision to only use one-half of the sales discussed in this email when figuring lost sales:

> I figure most people when they're trying to do business get a little puffery involved, and so I figured that this e-mail showed a higher figure than would actually occur, and I just used half of it to make sure that I wasn't being speculative. . . . Based on the ACI information and Paramount, I should have used a hundred percent, but I did not believe that that's—I believe people use puffery, is what I have seen in life.[19]

Further, Haenchen admitted in his deposition that he did not based the 50% discount on any specific methodology, only that he decided that it was a "safe" number based on his experience with others over the last twenty years, even though his prior business experiences did not involve the apparel industry.

The Court finds that discounting the potential sales to Paramount by 50% does not render Haenchen's opinion unreliable. By his own account, Haenchen relied on evidence in the record to come up with the base amount of projected sales to begin with. His discount of 50% was done out of an abundance of caution to account for the possibility that the email from Powell included some amount of puffery. Haenchen is not required to come up with an exact figure of lost profits, only a reasonable approximation. While Haenchen concedes that his discount of 50% is

---

[19](Doc. 212, Ex. 2 at 74–75.)

an estimate, he also testified that he believes, in his experience, that it was a reasonable amount to discount. A reasonable estimate is all that is required, and the Court is unable to determine that this figure, and Haenchen's explanation for it, would not be helpful to the trier of fact.

Guang Dong points the Court to deposition testimony by Powell, who is not an accountant, to discredit both Haenchen's reliance on this email and his use of the 50% discount. Powell testified that the email was never sent to ACI, but was sent to multiple other vendors and that Powell had brought it to a meeting set up from an ACI sales call. Powell also testified that it was not reasonable to assume that ACI would have received this business from Paramount or that it would have received 50% of this business from Paramount. The Court finds these arguments all go to the weight and not the admissibility of the evidence. There is evidence in the record, as described fully in the Court's summary judgment orders, upon which a reasonable jury could conclude that ACI would have received Paramount business if the initial order had gone smoothly. The Powell email relied upon by Haenchen is one such piece of evidence, as is another email sent from Powell to Chris Davis on October 9, 2000.[20] The jury will be able to hear Powell's testimony and evaluate these emails to determine the appropriate weight to give to both the emails, and Haenchen's reliance upon them in formulating his damage estimate. Unlike in the cases cited by Guang Dong, Haenchen is relying upon evidence in the record to substantiate his calculations, which is all that is necessary in order for his opinion to be sufficiently reliable to be admissible.[21] The appropriate weight to be given his testimony is for

---

[20](Doc. 217, Ex. 2 at 2.)

[21]*See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145–47 (1997) (discussing epidemiological studies relied upon by scientific expert that were found to be dissimilar to the facts presented in the litigation); *Elcock v. Kmart Corp.*, 233 F.3d 734, 754–56 (3d Cir. 2000) (finding damages expert's opinion relied on assumptions not supported by the record); *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078 (D. Kan. 2000) (finding damage estimates and assumptions have no evidentiary or statistical support).

the trier of fact to decide.

### 2. Assumption that ACI would Receive all ATTA Business

Haenchen calculated lost profits for 2003 to 2009 by looking at estimates of actual sales between ATTA and Paramount and assumed that ACI would have received 100% of the orders that Paramount instead placed with ATTA.[22] Guang Dong argues that assumption produces a flawed methodology because it fails to assess differences between ATTA and ACI in terms of sales quantities, sales prices, cost, and capacity. Because Haenchen did not conduct research about ATTA's business, Guang Dong urges that he is unqualified to assume that all Paramount business given to ATTA would have automatically gone to ACI had the Joint Venture Agreement worked out in the manner alleged by ACI and that such an assumption is without evidentiary support.

The Court disagrees that there is no evidentiary support for the proposition that the business directed at ATTA after the initial Paramount order with ACI fell through would have gone to ACI instead. The theory of the case is that ACI had nurtured and negotiated a relationship with both Guang Dong and Paramount that would have allowed it to obtain much more business from Paramount in the coming months and years. Instead, ACI urges that Guang Dong essentially sabotaged its ability to conduct this potential business and helped facilitate Alex He's new company, ATTA, in acquiring this business at Paramount's target prices. If the factfinder believes the evidence in support of this theory of the case, then of course it is reasonable to assume that ACI would have received the Paramount business that ATTA received instead. Firsthand knowledge about ATTA's business structure is not necessary in order for

---

[22]Haenchen was not provided with actual sales data before preparing the report. Instead, he relied on other sources of information provided during discovery to come up with estimates. The propriety of these estimates is addressed in the next section.

Haenchen's opinion to be admissible.[23]

Notably, Guang Dong points to no evidence in the record about the factors it discusses in its brief—sales quantities, sales prices, cost, and capacity—that would allow Haenchen or this Court to question whether the two companies are in fact reasonably comparable. It simply urges that Haenchen's failure to compare these factors constituted flawed methodology, with no explanation. Also, Guang Dong's reliance on *Cochrane v. Schneider National Carriers, Inc.*,[24] is misplaced. That case involved calculation of damages in a wrongful death action. The expert, "[w]ithout justification either in the evidence in the case or on any other rational basis, . . . assum[ed] that plaintiffs would have been the sole recipients of the financial support and services of decedent, who was an unmarried 16-year-old male at the time of his death, over the course of his lifetime."[25] Here, there is evidence in the case to support that Paramount's business went to ATTA rather than ACI as a result of the conduct alleged by ACI. The weight given to this evidence is for the factfinder to determine.

### 3. Reliance on Alex Levinson's Deposition Testimony

Next, Guang Dong argues that Haenchen failed to use the best available proof of lost sales for 2003 to 2009 when he relied upon Alex Levinson's February 8, 2007 deposition testimony concerning the estimated business between Paramount and ATTA. In calculating Paramount lost sales for 2003 to 2009, Haenchen looked at Alex Levinson's deposition testimony where he stated that in 2006, Paramount did $4 to $5 million dollars worth of business

---

[23]*See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (explaining that to the extent firsthand knowledge by the expert is relevant, it goes to the weight and not the admissibility of the testimony).

[24]980 F. Supp. 374 (D. Kan. 1997).

[25]*Id.* at 378.

with ATTA. He testified that each year before that, Paramount did about $1 million less. In his testimony, Levinson emphasized that these were ballpark figures and that he was only estimating. Also, Haenchen looked at the deposition transcript of Wu "Bert" Ruiwen of Guang Dong, who stated that ATTA paid Guang Dong about $2 million in 2003. Based on these sources, Haenchen concluded that the lost sales should be increased by $1 million each year after 2002, reasoning that the resulting figure in 2006 ($4,447,000) was corroborated by Levinson's estimate of $4 to $5 million in sales.

Haenchen also relied on Levinson's testimony about total headwear sales and growth trends by Paramount. Levinson testified that Paramount was selling approximately $40 million and buying approximately $20 million in headwear in 2000 and that by 2006, it was selling approximately $60 million and buying approximately $30 million. Haenchen used these figures to estimate the percentage of Paramount lost sales estimated to total Paramount purchase estimates, concluding that ACI would have grown from 1% of Paramount's purchases in 2001 to 15% in 2006. Given Levinson's further testimony that Paramount used about six vendors at any given time for headwear purchases, Haenchen reasoned that 15% of its business would be a conservative figure as it would still sell less than one-sixth of Paramount's total business.

Under Kansas law, evidence of lost profits must be established with "reasonable certainty."[26] However, absolute certainty is not required; the factfinder just must be guided by a rational standard.[27] Because Haenchen relied on evidence of ballpark estimates instead of the actual sales numbers between Paramount and ATTA, Guang Dong argues that the calculations

---

[26] *Olathe Mfg., Inc. v. Browning Mfg.*, 915 P.2d 86, 103–04 (Kan. 1996).

[27] *Id.* at 104.

are not reliable.[28] The Court agrees with ACI that Haenchen's reliance on these figures does not render his opinion unreliable. It is undisputed that Haenchen did not have the benefit of reviewing the actual sales data prior to preparing the supplemental report as those were not provided to ACI until after he had prepared the report. The actual sales data was provided about eleven days prior to Haenchen's deposition. Haenchen testified, however, that he did review the actual sales data prior to his deposition and "it appeared to me that these numbers were slightly higher than the numbers I used in my report, so it gives a little bit of credence to my numbers, but I did not increase the damages in my report because of these."[29]

Given this, the Court finds it difficult to understand how Haenchen failed to use the "best available proof" to form his opinion when the actual sales data was not made available until after the report was prepared. Further, based on his testimony, the actual numbers show that his calculations, based on Levinson's estimates, are conservative. Once again, this is a weight and not an admissibility issue. The jury may consider how much weight to give to this opinion, and could certainly conclude, based on this testimony that the damage award should be even a bit higher.

    **4.    Lost Profits Extending to 2009**

Guang Dong also challenges Haenchen's assumption that a long-term business relationship between Paramount and ACI would have lasted for six years. It contends that he based this assumption on statements from ACI President Chris Davis that a six-year relationship was long-term and then used half of that figure. But Haenchen testified, and his report bears out,

---

[28]In the original motion, Alex He and ATTA actually suggest that Haenchen "chose" to rely on Levinson's estimates rather than actual sales data. (Doc. 212 at 22 ("He is certain that the estimates given by Mr. Levinson are not accurate to the nearest $1,000, but chose not to use the actual sales data."))

[29](Doc. 212, Ex. 2 at 17.)

that he assumed a six-year long-standing relationship also because Paramount and ATTA had been doing business for about six years. Further, Haenchen testified that because ATTA continued to do business with Paramount beyond that six-year mark, it was appropriate and safe to assume that it would continue for three more years before Paramount would switch to another vendor on a regular basis. If the jury instead believes Powell, that Paramount had no intention of placing future orders with ACI, then it can certainly place little weight on Haenchen's report.

### C.     *Failure to Properly Consider ACI's Sales History*

Finally, Guang Dong argues that the differences between Haenchen's original report and his supplemental report render his opinion unreliable. The Court disagrees. As Haenchen testified, there was much more information available to him when preparing the supplemental report. The fact that his original report was "way off" was a product of the nature of the lawsuit changing to include new claims and parties. Also, more discovery was made available to him that he did not have an opportunity to review before preparing the first report.

Guang Dong also points to ACI's sales history as evidence that Haenchen's opinion is not reliable. It argues that because ACI's gross headwear sales declined between 1999 and 2001, it is mistaken to conclude that its sales would have risen thereafter. But Haenchen testified that he used a three-year average to track the sales growth for ACI because of its small size and that he took into consideration that some of ACI's significant customers during those years had completely left the headwear business. "Because of that, you would see a decline, but that doesn't necessarily mean that your decline of ongoing business, i.e. Cintas and Paramount, would have to drop off, also."[30] The Court finds this explanation to be reasonable and the mere fact of this decrease does not call into question the reliability of Haenchen's methodology in

---

[30](Doc. 212, Ex. 2 at 69–70.)

calculating damages.

In sum, the Court finds that Haenchen's expert testimony is sufficiently reliable and relevant under Rule 702, *Daubert*, and *Kumho Tire* and, thus, denies the motion in limine to exclude this expert testimony.

**IT IS THEREFORE ORDERED BY THE COURT** that the Motion in Limine to Exclude Testimony of ACI Expert Steven Haenchen by Counterclaim Defendants (Doc. 211) is **denied**.   Guang Dong's Motion for Joinder (Doc. 213) is **granted**.

**IT IS SO ORDERED**.

Dated this 17th day of January 2008.

                                     S/ Julie A. Robinson
                                     Julie A. Robinson
                                     United States District Judge